IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CR-54 |
| | ) | (PHILLIPS/SHIRLEY) |
| HUGH WEST, | ) | |
| | ) | |
| Defendant. | ) | |

### REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter comes before the Court upon the defendant's Motion to Suppress [Doc. 10], filed on July 12, 2005. The parties came before the Court for a suppression hearing on July 27, 2005. The government was represented by Assistant United States Attorney W. Brownlow Marsh, and the defendant was represented by Assistant Federal Defender Paula Voss and Attorney Aubrey Davis.[1] At the conclusion of the hearing, the Court took the motion and related filings under advisement.

The defendant is charged [Doc. 1] in a four-count indictment alleging that on February 11, 2004, the defendant possessed five grams or more of methamphetamine with intent to distribute (count one); possessed a loaded Bryco Arms .25 caliber pistol in furtherance of a

---

[1] The Court notes that Mr. Davis is on the training panel to be a Civil Justice Act (CJA) attorney.

1

drug trafficking crime (count two); possessed equipment, chemicals, products, and materials which are used in manufacturing methamphetamine (count three); and was a felon in possession of a Winchester .22 caliber rifle (count four). The defendant contends [Doc. 10] that the February 11, 2004 stop of his truck violated his Fourth Amendment rights because the officer had neither probable cause nor reasonable suspicion to stop him. The government responds [Doc. 11] that the officer properly stopped the defendant because he had probable cause, or alternatively reasonable suspicion, to believe that the defendant was driving without a valid driver's license.

## I. SUMMARY OF TESTIMONY

At the suppression hearing, the government presented the testimony of Detective Tracy Ivy of the Jefferson County Sheriff's Department. Detective Ivy testified that he had served in this capacity for eight years and that on February 11, 2004, he was conducting some investigations. He said that around 3:00 p.m., while traveling between sites, he saw the defendant driving his truck on Highway 11E.[2] He said that he recognized the defendant, whom he had previously arrested and who had also been a victim in another case, which Ivy had investigated. He stated that the last time he had seen the defendant, the defendant's license had been suspended. Detective Ivy said he called the central dispatcher on his cellular phone and asked that the dispatcher check the status of the defendant's driver's license. The dispatcher

---

[2]The Court notes that this road was also referred to as Highway 92 or Flat Gap Road at different times during the hearing. While this apparent inconsistency was not addressed at the hearing, the Court finds that the specific name of the road is not significant to the analysis or decision in this report.

responded that the defendant's driver's license was in fact suspended, and Detective Ivy stopped the defendant based on that response.

Detective Ivy testified that he approached the defendant's truck and asked to see his driver's license. Ivy stated that the defendant said, "Tracy, you know I don't have a driver's license." He said he asked the defendant to step out of the truck, told the defendant he was arresting him for driving without a license, and frisked him. He said he found a small, loaded gun in the defendant's pocket. He also found methamphetamine.

On cross-examination, Detective Ivy testified that he had last arrested the defendant on a methamphetamine charge sometime during the previous year, although he did not recall the date. He identified a Jefferson County Warrant [Ex. 2] signed on July 10, 2003, as likely relating to his last arrest of the defendant. He noted that the warrant gave the date of contact with the defendant as July 9, 2002. He acknowledged that he had never arrested the defendant for a traffic violation. He said that he had last seen the defendant in court trying to get his driver's license back sometime in 2003. He said that he did not recall whether it was General Sessions Court or night court and that it could have been in 2002.

Detective Ivy said that at the time of the present incident, he was preparing to turn onto Highway 11E, when he saw the defendant two vehicles in front of him. He said that he saw the defendant's face and that he recognized the defendant's black and silver, two-wheel-drive Chevrolet or GMC truck because it had been previously stolen and recovered. He agreed that the truck was registered to the defendant's mother, Delores West. He said that he followed the defendant down Highway 11E. He said that he believed it was between 3:00 and 4:00 p.m. and that he did not recall the weather conditions on that day. He said that the defendant had a

3

passenger in the truck and that the truck had heavily tinted windows. However, he testified that he saw the side of the defendant's face as the defendant turned left onto Highway 11E because the defendant's window was half-way down.

Detective Ivy testified that after he arrested the defendant, he found a gun on the defendant's person and he found drugs in the pocket of a jacket on the front seat of the truck. He said that the morning following his arrest, the defendant gave a statement that the items in the truck were his. He agreed that the defendant said, "Meth in the truck is mine. It came out of my truck so I guess it's mine."

Detective Ivy was questioned about a report [Ex. 2] generated by the Tennessee Bureau of Investigation regarding calls to the Jefferson County Central Dispatch on February 11, 2004. The report reflects that at 15:02, the dispatcher received a call on Hugh West. Detective Ivy testified that 15:02 is 3:02 p.m. "Nashville time" and 4:02 p.m. Eastern Standard Time. He said that the defendant was stopped and subsequently arrested shortly thereafter.

The defendant called Charles A. Brown, a criminal investigator for the Federal Defender Services. Mr. Brown testified that while assisting in this case, he took photographs of the defendant's truck, which was located in an impound lot. He identified two photographs [Exs. 3 & 4] of the defendant's truck that show the tinting on the back window and driver's side window. Mr. Brown said that the photographs reveal that one cannot see the steering wheel through the windows. He stated that he was five feet away from the truck when he took the pictures. He opined that it would be difficult to see someone inside the truck. On cross-examination, Mr. Brown testified that he identified the truck as the defendant's by contacting the police and then the towing service. He also stated that computer records link the license plate

4

number on the truck to the defendant's mother.

## II. FINDINGS OF FACT

The Court finds that around 4:00 p.m., on February 11, 2004, Detective Tracy Ivy spotted the defendant's truck two vehicles in front of him as he prepared to turn onto Highway 11E. The detective saw the defendant's face through the defendant's window, which was lowered half-way, as the defendant turned left. Detective Ivy recognized the defendant and his truck and believed that the defendant did not have a valid driver's license because he had been present sometime in 2003 when the defendant was in court attempting to get his license reinstated. The detective called the dispatcher on his cellular telephone and asked for a check on the status of the defendant's driver's license. The dispatcher responded that the defendant's driver's license was suspended.

Detective Ivy stopped the defendant and walked up to the truck, which contained the defendant and a passenger. When he asked the defendant for his driver's license, the defendant responded that the officer knew that he did not have one. Detective Ivy asked the defendant to step out of the car and told him that he was under arrest for driving on a suspended license. He frisked the defendant and found a loaded gun in the defendant's pocket. He searched the interior of the truck and found methamphetamine in the pocket of a jacket on the front seat. The defendant made a statement to law enforcement the following morning.

## III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or

5

seizures. U.S. Const. amend IV. The defendant contends that his rights under the Fourth Amendment were violated because the officer had no basis to stop his truck on February 11, 2004. He contends that the officer lacked probable cause or even reasonable suspicion to stop him because (1) the officer's information that the defendant's driver's license was suspended was stale and (2) the officer could not positively identify that he was driving based upon the officer's recognition of his truck. He maintains that the officer's identification of him as the driver and belief that his license was suspended were merely hunches that could not justify stopping his truck. Thus, he contends that the evidence found during the search of his person and his truck as well as his subsequent statement to the police must be suppressed as stemming from the illegal stop. The government contends that the officer had probable cause or, at the very least, reasonable suspicion to stop the defendant because he identified the defendant on sight and confirmed with the dispatcher that the defendant was driving on a suspended license prior to conducting the stop.

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. Id. at 388. Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. Ferguson, 8 F.3d

6

at 392 (citing Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983)).

An officer may also briefly detain an individual on less than probable cause: "[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted). Although an officer may not rely upon a mere hunch to support a Terry stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002). Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. Martin, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Id. at 397.

The government likens this case to United States v. Sandridge, 385 F.3d 1032 (6th Cir. 2004), cert. denied 125 S. Ct. 1099 (2005). In Sandridge, the officer saw the defendant driving a yellow Cadillac in downtown Chattanooga, Tennessee, on March 27, 2002. Id. at 1033. The officer had seen the defendant driving the same car either a day or two or a few weeks earlier and had conducted a check of the defendant's license at that time, learning that the defendant did not have a valid driver's license. Id. at 1033-34. Documentation later confirmed that this check occurred twenty-one days before March 27. Id. at 1035. Thus, on March 27, the

7

officer stopped the defendant for driving without a valid license. Id. at 1034. Following the officer's confirmation that the defendant lacked a valid driver's license and the defendant's subsequent arrest, officers discovered illegal drugs and drug paraphernalia in his car. Id. The Sixth Circuit held that the officer's check of the defendant's driving status three weeks earlier provided reasonable suspicion that the defendant was driving without a valid license on March 27. Id. at 1036. In response to the defendant's argument that the check three weeks earlier was stale, the court reasoned that

> In situations where the criminal activity is of an ongoing nature, it will take longer for the information to become stale. See United States v. Greene, 250 F.3d 471, 480 (6th Cir.2001) ("Evidence of ongoing criminal activity will generally defeat a claim of staleness."). Driving without a valid license is a continuing offense–in contrast, say, to a speeding or parking violation–and there are no facts in the record suggesting that Officer Grubb should have assumed that Sandridge's ongoing offense had ceased between March 5 and March 27, 2002.

Sandridge, 385 F.3d at 1036; see also United States v. Mans, 999 F.2d 966, 968 (6th Cir. 1993) (holding that an officer had reasonable suspicion to stop the defendant because the officer recognized the defendant from prior arrests and knew that his driver's license had been revoked).

The present defendant also argues that the officer's information that the defendant's license had been suspended, which stemmed from a court appearance sometime the previous year, was too stale to support a reasonable belief that the defendant was driving on a suspended license on February 11, 2004. The Court finds that regardless of a prior occasion when Detective Ivy overheard that the defendant's license was suspended, Ivy confirmed with the dispatcher on February 11, 2004, just moments before stopping the defendant, that the

8

defendant's license was suspended. Accordingly, the Court finds that this information was not stale.

The defendant also argues that Detective Ivy could not have known that he was the one driving the black and silver truck on the day in question. He argues that although the officer recognized the truck, which belonged to the defendant's mother, the officer could not identify the driver prior to the stop due to the heavily tinted windows. The Court finds that Detective Ivy saw the side of the defendant's face through the defendant's partially opened window as the defendant turned onto Highway 11E two car-lengths in front of the detective. Thus, the detective was not looking through the tinted window when he identified the defendant, nor did he identify the defendant based solely upon his recognition of the truck. The Court finds that Detective Ivy recognized the defendant upon seeing him because he had been involved in prior cases in which the defendant was the victim or the perpetrator. Accordingly, the Court finds that the defendant positively identified the defendant prior to stopping him on February 11, 2004.

Once he saw the defendant driving the truck and confirmed with the dispatcher that the defendant's license was suspended, Detective Ivy had probable cause to believe that the defendant was committing a crime, that of driving on a suspended license. See Tenn. Code Ann. § 55-50-504.[3] Thus, the Court finds that Detective Ivy properly stopped and arrested the

---

[3]Section 55-50-504 provides in pertinent part that

> [a] person who drives a motor vehicle within the entire width between the boundary lines of every way publicly maintained which is open to the use of the public for purposes of vehicular travel, or the premises of any shopping center, manufactured housing complex or apartment house complex or any other

9

defendant. After arresting the defendant, the detective could search his person, see Chimel v. California, 395 U.S. 752, 762-63 (1969), and his truck, see New York v. Belton, 453 U.S. 454, 460 (1981), incident to that arrest. Because the Court has found no problem with the stop, the Court likewise finds that the stop is not a basis for the suppression of the defendant's statement. Accordingly, the Court recommends that the defendant's suppression motion be denied.

## IV. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress [**Doc. 10**] be **DENIED**.[4]

Respectfully submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

        premises frequented by the public at large at a time when the
        person's privilege to do so is cancelled, suspended, or revoked
        commits a Class B misdemeanor.

Tenn. Code Ann. § 55-50-504(a)(1).

[4]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).